UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X

HEATHER WEDDLE,

                    *Plaintiff,*

    -against-


CFA INSTITUTE,
                    *Defendant.*
----------------------------------------------------------X

**24 CV 5308**

Case No.

**<u>PRO SE COMPLAINT</u>**

FILED
U.S. DISTRICT COURT
2024 JUL 15 AM 9:42
S.D. OF N.Y.W.P.

1

Plaintiff Heather Weddle ("Weddle" or "Plaintiff"), alleges as follows:

**PRELIMINARY STATEMENT**

1.    Heather Weddle, a talented and hardworking professional with over two decades of national and international marketing, brand, strategy, and association experience, accepted the position of CFA Institute's Director of Member Outreach in April 2017. For over five years, Weddle carried out her duties with only positive feedback and results, attested to by two promotions within less than four years after starting at the company.

2.    Beginning with a change of leadership in September 2022 which installed Randi Tolber as Weddle's supervisor, CFA Institute created a work environment so toxic that Weddle developed clinical anxiety, an affliction she had never before experienced.

3.    When Weddle disclosed her anxiety to CFA Institute and requested a reasonable accommodation for her resulting disability, the company quickly retaliated by issuing her a Performance Improvement Plan which criticized her for the very anxiety symptoms for which she had requested accommodation, and threatened her with termination.

4.    Further, instead of reasonably accommodating Weddle's anxiety symptoms, which were a direct result of her supervisor's bullying and harassment, CFA Institute provided Weddle with "accommodations" that actually added to her workload and increased the number of anxiety-producing interactions Weddle was required to have with Tolber.

5.    Despite Weddle's continually mounting anxiety under these hostile work conditions,  she continued to work hard and fulfill her job responsibilities, up until the point when her condition, and the lack of accommodations offered by CFA, required her to take an eight-week medical leave. Weddle took the leave, returned on schedule, and stepped back into

2

her duties. Upon her return, Tolber confirmed that Weddle had fulfilled the requirements of her PIP and the PIP's term had elapsed.

6.      Although the environment and Tolber's behavior had not changed, and her anxiety had not abated, Weddle persevered in fulfilling her job duties. However, having failed to push her out of the company by withholding the reasonable accommodations to which she was legally entitled, CFA Institute proceeded to terminate Weddle approximately one month after her return from leave, claiming she had not met the requirements of the PIP, which by then had been fulfilled and had expired.

7.      Through its discriminatory and retaliatory behavior, CFA Institute violated Federal, state, and local law by discriminating against Weddle because of her legally protected disability and by retaliating against her for requesting that her disability be reasonably accommodated.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 USC §1331, and supplemental jurisdiction under 28 U.S.C. §1367.

9.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

10.     Venue is also proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant CFA Institute resides in this District.

11.     Defendant CFA Institute is subject to this Court's personal jurisdiction pursuant to New York C.P.L.R. § 302(a)(1) because it transacts substantial business in New York, and Plaintiff's claim arises from Defendant's business activities in this state.

12.    CFA Institute maintains an office at 292 Madison Avenue in New York City, which, upon information and belief, is the home office of roughly 40 employees.

13.    Plaintiff was assigned to report into the Manhattan office during her entire time working for CFA Institute. Prior to the COVID-19 pandemic, Plaintiff commuted into the Manhattan office every workday. During the pandemic, Plaintiff began working remotely from her home, first in New Jersey and then Connecticut. However, Plaintiff continued to commute into the Manhattan office on a regular basis for meetings, trainings, and any other time her presence was required.

## PARTIES

14.    Plaintiff Heather Weddle is an adult individual residing in Westport, Connecticut.

15.    Defendant CFA Institute is an international not-for-profit organization which provides education and services for financial/investment professionals. CFA Institute is incorporated as a Virginia not-for-profit corporation with headquarters in Charlottesville, Virginia and an office at 292 Madison Avenue in New York City.

16.    CFA Institute has roughly 500 employees.

## FACTUAL ALLEGATIONS

### Weddle's Background and Excellent Performance at CFA

17.    Plaintiff Weddle has spent her career working in marketing for various professional and business associations, holding positions such as Brand Director, Marketing Director, and Strategy Director.

18.    In Spring 2017, Weddle applied for the position of Director of Member Outreach at Defendant CFA Institute ("CFA" or the "company").

4

19.     With over fifteen years of national and international marketing, brand, strategy, and association experience, Weddle demonstrated a keen ability for designing marketing and organizational strategies that enhance brand value and drive organizational growth.

20.     CFA offered Weddle the Director, Member Outreach position on or about April 4, 2017, which she accepted.

21.     Weddle began working at CFA on or about April 28, 2017.

22.     As Director, Member Outreach, Weddle was tasked with developing and managing process, protocols, and delivery of member communications strategy across all regions domestically and international. She also served as key business lead for member personalization initiatives and provided subject matter expertise and support in cross-collaboration on projects throughout the organization.

23.     Initially, Weddle enjoyed great success at CFA. She developed and launched a global member communication campaign that increased engagement and drove operational efficiencies. She earned recognition from CFA for bringing a new technological capability to the organization.

24.     On September 11, 2019, Weddle was promoted to Senior Director of Member and Society Marketing with an expanded remit including supporting communications and marketing for 160 CFA Societies around the globe.

25.     In the following months, Weddle continued to thrive in this new position. She was one of just a few Directors selected to participate in various internal leadership courses, as well as external training programs.

26.     During this time, she received positive performance evaluations, annual pay increases, and bonuses.

27.    However, during this time, the work culture at CFA grew increasingly uncertain. In about September 2019, CFA hired Margaret Franklin as its new CEO. Shortly after her arrival, the COVID-19 pandemic upended the business landscape, leading to several key departures from the company. The work culture grew tense and competitive, shifting away from what had previously been a collaborative, inclusive, and positive environment.

28.    Despite the challenges posed by CFA's deteriorating work culture, Weddle continued to perform well and received consistently positive feedback on her performance.

29.    In summer 2020, CFA's Managing Director and Chief Marketing Director Michael Collins and Weddle's supervisor approached Weddle about leading the company's Membership Division. The company was undergoing restructuring, and Collins considered Weddle a perfect fit for the role of Head of Global Membership reporting directly to him.

30.    Weddle accepted the role and began her new position as Head of Global Membership in October 2020. Weddle continued to succeed in this new role, receiving positive feedback on her performance for the next nearly two years.

*Randi Tolber Creates a Work Environment so Toxic that Weddle Develops Anxiety*

31.    On September 1, 2022, following several months of upheaval in CFA's leadership and the departure of Collins from the company, Weddle began reporting to Randi Tolber, CFA's Senior Head of Global Society Relations.

32.    Weddle was concerned about her new reporting relationship from the beginning. She and Tolber had previously worked together as peers, collaborating on marketing and communications initiatives. During that time, Weddle complained to CFA's HR department that Tolber had been using and/or representing Weddle's work as her own without permission.

6

33.    When Weddle raised this issue directly with Tolber at HR's suggestion, Tolber was not receptive to her feedback and denied that she had acted inappropriately.

34.    Given this history, Weddle was worried that Tolber would not be supportive of her as a subordinate. Unfortunately, she was right.

35.    As she had done before, Tolber consistently represented Weddle's work, thought leadership, and operational successes as her own to other senior leaders at CFA without attribution.

36.    Further, Tolber began criticizing Weddle for purported behavioral deficiencies, telling her to "talk less" and "actively listen."

37.    Weddle is typically a straightforward and plainspoken person – she discusses her thoughts and opinions openly. This is how she has operated throughout her career, including during her time at CFA, and it has never negatively impacted her job performance. On the contrary, she was promoted twice in her first approximately 3.5 years at the company.

38.    Weddle began experiencing anxiety almost immediately upon moving to Tolber's team. The transition was unorganized with inconsistent directions, unclear goals and expected outcomes, and little acknowledgement. Weddle received little support for her work with colleagues and leaders.

39.    In essence, Weddle's role was being reduced from one where she was a strategic leader for the company to one where she had mainly administrative responsibilities.

40.    This continued throughout Weddle's first six months reporting to Tolber. Over time, the deteriorating environment eroded her personal relationships with colleagues and affected her confidence.

7

41.    Weddle became wracked with self-doubt and began withdrawing during meetings with peers and leaders, contributing less and worrying constantly about her reputation and ability to do her job. She developed difficulty sleeping and was overwhelmed with thoughts of losing her job.

*Weddle Discloses her Anxiety and, Upon Requesting Reasonable Accommodation, is Placed on a Performance Improvement Plan*

42.    On April 26, 2023, Weddle met with Tricia Bezek, CFA Alliance's Global HR Business Partner and Global Senior Manager of Talent Acquisition, to discuss the deteriorated working relationship with Tolber and how it caused Weddle to develop anxiety.

43.    Weddle provided emails demonstrating how Tolber misrepresented and mischaracterized her actions and belittled her.

44.    Weddle also told Bezek it felt like Tolber was stripping her of the strategic aspects of her role.

45.    Bezek suggested Weddle meet with Megan Conklin, CFA's Employee Relations Manager, to discuss ADA accommodations for her anxiety.

46.    On May 1, 2023, Weddle met with her primary care doctor about her newly developed anxiety. This was the first time she had experienced this issue, and her doctor prescribed her anti-anxiety medication and recommended she begin talk therapy.

47.    On or about May 2, 2023, Weddle met with Conklin via video call.

48.    During this call, Weddle informed Conklin about her anxiety condition and described the way her anxiety was impacting her work and relationships at CFA.

49.    Weddle also disclosed that her anxiety stemmed directly from her strained working relationship with Tolber.

8

50.    Conklin confirmed that Weddle's anxiety was a disability and told her the company would be willing to discuss potential accommodations.

51.    On or about May 2, 2023, Conklin sent Weddle a document summarizing this conversation. The document noted, among other things, that Weddle's anxiety impacted her ability to deliver publicly; affected her relationship building, career potential, and performance reviews; inhibited her ability to work in certain team environments; and caused self-doubt and deterioration of her self-confidence.

52.    CFA gave Weddle a week, until May 9, 2023, to decide whether she wanted to proceed with an accommodation request. Potential accommodations identified by CFA at the time included adding breaks between meetings, reducing the frequency of Weddle's 1:1 meetings with Tolber, and having Tolber provide Weddle with a written "list of priorities, expectations, and instructions on any new tasks or projects to be received after one on ones and/or as needed."

53.    Weddle confirmed on May 5, 2023, that she would like to proceed with the accommodation request.

54.    *The same day* Weddle confirmed she would like to move forward with an accommodation request,  and just three days after Weddle initially requested accommodation, CFA issued her a Performance Improvement Plan ("PIP") authored by Tolber.

55.    The PIP primarily criticized Weddle's communication style: she was placed on notice for allegedly not being inclusive or collaborative, being argumentative and critical, and expressing that she and her team were "worried" about the outlook of their work.

56.    Essentially, Weddle was being explicitly criticized and disciplined for the effects of her anxiety, which the company had explicitly labeled a disability just days before: much of

9

the purportedly problematic "behavior" identified by Tolber in the PIP were precisely the symptoms of her anxiety that Weddle had disclosed to Conklin.

57.     The PIP, in direct contrast to the company's own proposed accommodation of reducing Weddle's 1:1 time with Tolber, actually required that she schedule *additional* meetings with Tolber to discuss her progress over the course of the PIP.

58.     The PIP gave Weddle 45 days to "improve," with an end date of June 19, 2023, and stated that if she failed to satisfy the PIP she could be terminated without notice.

59.     Weddle felt dismayed and demoralized upon receiving the PIP. Not only did it feel as though CFA was punishing her for the symptoms of her clinical anxiety -- which itself was caused by CFA's toxic work environment -- but the punishment itself would only lead to further anxiety, aggravating Weddle's existing disability.

60.     On or about May 17, 2023, Weddle met with Conklin to discuss her disability and submit a medical certification form requesting accommodations under the ADA.

61.     The medical certification form verified that she suffered from anxiety, and that her anxiety negatively affects her interactions with others, creates difficulty building relationships, and limits her social interaction.

62.     During the May 17 meeting, Conklin provided Weddle with a revised list of potential accommodations which seemed designed to increase, rather than accommodate, her anxiety.

63.     According to the new list, CFA was no longer willing to adjust the frequency of Weddle's 1:1 meetings with Tolber, but bizarrely noted that Weddle would be allowed to turn off her camera during these meetings, as if her anxiety was caused simply by seeing Tolber's face, and not Tolber's constant bullying and belittling.

10

64.    CFA further agreed to allow Weddle a 30-minute break in the morning and a *five minute* break in the afternoon. CFA did not explain why it believed allowing Weddle what amounts to a brief bathroom break in the afternoon would accommodate her anxiety.

65.    CFA also stated it was no longer willing to have Tolber provide Weddle with a written list of priorities, expectations, and instructions. Instead, CFA's proposed accommodation actually *increased* Weddle's workload as well as her interactions with Tolber: Weddle would be responsible for drafting (i) a written summary of each meeting she had with Tolber, (ii) a list of priorities for each week, and (iii) a summary of her tasks. Tolber would then respond by confirming the list and/or providing additional context.

66.    Weddle was disappointed and disheartened to see that CFA's proposed accommodation amounted to a significant increase in both her workload and her interactions with Tolber – the direct opposite of the accommodations she had originally discussed with Conklin. Nonetheless, wanting to avoid further retaliation as she had already been placed on a PIP immediately upon requesting a reasonable accommodation, Weddle agreed to the accommodations proposed.

67.    From about May 17, 2023, to June 12, 2023, Weddle continued to perform her duties as expected and did her best to address the issues outlined in the PIP. She worked on two special projects which required cross-divisional video calls and collaboration, and also planned and led a two-day, in-person cross-divisional strategy planning workshop with staff and outside consultants at the company's headquarters in Charlottesville, VA.

68.    No feedback was provided by Tolber or anyone else during or after any of these activities, which were very difficult for Weddle to execute given the above-noted limitations caused by her anxiety symptoms. Rather than work with Weddle on her supposed

communication deficiencies, as contemplated by the PIP, Tolber simply sent Weddle a brief email at one point describing leadership expectations.

69.    Unsurprisingly given the ongoing PIP and CFA's lackluster "accommodations," Weddle's working conditions did not improve and her anxiety continued to worsen.

70.    On or about June 12, 2023, Weddle met with her primary care doctor. When Weddle reported that her condition was not improving even with medication, her doctor recommended she take a medical leave of absence from CFA.

71.    Later the same day, Weddle met with Conklin and submitted documentation requesting an 8-week medical leave from June 14, 2023, through August 8, 2023. CFA raised the possibility of using FMLA leave and provided Weddle with resources on applying for short-term disability.

72.    The next day, June 13, 2023, Weddle again met with Conklin and Bezel to discuss the leave of absence. Conklin informed her that the PIP – due to end on June 19, 2023, would be revisited and possibly extended upon her return from leave.

73.    Weddle was extremely disappointed to hear this and asked on what basis the company would extend her PIP, given there were only a few business days remaining until its expiration and she had received no indication that she was not fulfilling the PIP's conditions.

74.    Conklin refused to provide Weddle with any additional details about the PIP at that time.

75.    Weddle began medical leave on June 14, 2023.

76.    During her leave, Weddle exchanged several emails with Conklin regarding administrative issues. On June 25, 2023, Weddle submitted a Return to Work form, which included a request that her ADA accommodations remain in place upon her return.

77.    Weddle returned to work as planned on August 9, 2023.

78.    Unfortunately, there was no change in Tolber's conduct toward Weddle.

79.    On or about August 10, 2023, Weddle met with Tolber via videocall, and Tolber confirmed that Weddle had successfully completed her PIP. During the call, Weddle shared with Tolber that she was going to schedule a meeting with Bezek to discuss her experience with the PIP.

80.    Accordingly, on August 22, 2023, Weddle met with Bezek to discuss the PIP process. Weddle informed Bezek that she had not received most of the feedback or counseling contemplated by the PIP, and asked if she would be eligible for her annual bonus. Bezek could not answer Weddle's questions about the bonus and suggested that Weddle meet with Tolber about the PIP process.

81.    On or about September 9, 2023, Weddle met via conference call with Tolber and Bezek to review the PIP in more detail. The agenda for this meeting included (1) specific feedback from Tolber about Weddle's performance under the PIP, (2) confirmation of the PIP's successful completion and its implications for Weddle's year-end bonus, and (3) disclosure by Tolber of her expectations of Weddle's role going forward.

82.    On the call, Tolber told Weddle that she would receive a "Needs Improvement" rating on her year-end review, which eliminated her from the bonus pool. Weddle had never received a "Needs Improvement" rating before, and she was confused and frustrated because – having satisfied the PIP and received Tolber's endorsement – she believed she had undertaken the necessary "Improvement."

83.    Tolber went on to tell Weddle that in her role she was expected to manage the team. This was extremely concerning to Weddle because, as discussed *supra*, Tolber had been

13

systematically stripping her of her strategic and managerial authority and relegating her to administrative tasks. Therefore, Weddle could not understand how she was to lead the team when most of her opportunities to do so had been removed.

84.     This conversation made Weddle extremely anxious. It felt as though all the work she had done to meet the PIP requirements and address her anxiety had been for nothing, and that Tolber and the other CFA employees from whom she had sought help were setting her up to be terminated.

85.     As the call continued, Weddle shared that in order to be successful at CFA she felt she needed (i) greater transparency from Tolber, (ii) permission to lead projects and/or meetings without Tolber, (iii) permission to make decisions for the department commensurate with the level of her role, and (iv) Tolber's support for her work with internal staff and leadership.

86.     Neither Tolber nor Bezek responded to or expressed any interest in the substance of Weddle's requests. Instead, Bezek told Weddle that her tone was "unprofessional" and then Bezek and Tolber terminated the call.

87.     On or about September 12, 2023, Weddle spoke with Bezek to share her frustration with the PIP, the PIP meeting, and Tolber's decision on her year-end rating. Weddle directly asked Bezek how HR could advocate for her and her improvement. Bezek simply confirmed that Weddle could use the comments section of the year-end review form to indicate that she disagreed with her rating.

### *Weddle's Discriminatory and Retaliatory Termination*

88.     On or about the morning of September 15, 2023, Tolber emailed Weddle requesting a fifteen-minute phone call. When Weddle advised she was in a workshop that

morning, Tolber requested that she step out of the workshop to take the call and Weddle complied.

89.    Bezek joined the call with Tolber and Weddle. Tolber spoke first and stated that the expectations for conduct as outlined in the PIP were not being sustained and, therefore, Tolber and Bezek had made the decision to terminate Weddle's employment.

90.    Tolber then handed the conversation off to Bezek, who outlined the details of Weddle's termination and the administrative steps that needed to be taken.

91.    The call ended after ten minutes, and Weddle was locked out of all work systems shortly thereafter.

## FIRST CAUSE OF ACTION

### (Disability Discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 *et seq.*, as modified by the Rehabilitation Act of 1973, 29 U.S.C.A. § 701 *et seq.*)

92.    Plaintiff realleges and incorporates all prior paragraphs as if they were set forth again herein.

93.    Defendant employs more than fifteen employees.

94.    Plaintiff suffers from a disability within the meaning of the ADA: her anxiety results in physical impairments that substantially limit numerous major life activities, including but not limited to, working, sleeping, and communicating.

95.    Plaintiff was more than qualified to perform the essential functions of her job with reasonable accommodations: she was promoted twice, most recently to her position as Director of Member Outreach, within less than four years after she was hired, and at the time of her termination had more than two decades of national and international marketing, brand, strategy, and association experience.

96.    Defendant systematically undermined, disciplined, and ultimately terminated Plaintiff because of her disability.

97.    Defendant is therefore liable to Plaintiff for compensatory relief and attorney fees and costs.

## SECOND CAUSE OF ACTION

**(Regarded-As Disability Discrimination under the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 *et seq.*, as modified by the Rehabilitation Act of 1973, 29 U.S.C.A. § 701 *et seq.*)**

98.    Plaintiff realleges and incorporates all prior paragraphs as if they were set forth again herein.

99.    Upon information and belief, Defendant employs more than fifteen employees.

100.    Defendant regarded Plaintiff as suffering from a disability within the meaning of the ADA: once Plaintiff disclosed her anxiety symptoms, Defendant perceived Plaintiff as less capable of performing her job as evidenced by its immediate establishment of a PIP.

101.    Plaintiff was more than qualified to perform the essential functions of her job with reasonable accommodations: she was promoted twice, most recently to her position as Director of Member Outreach, within less than four years after she was hired, and at the time of her termination had more than two decades of national and international marketing, brand, strategy, and association experience.

102.    Defendant systematically undermined, disciplined, and ultimately terminated Plaintiff because of its erroneous perception that her disability made her a less capable employee.

103.    Defendant is therefore liable to Plaintiff for compensatory relief and attorney fees and costs.

## THIRD CAUSE OF ACTION

**(Retaliation under the Americans with Disabilities Act of 1990, 42 U.S.C.A. §**
**12101 *et seq*., as modified by the Rehabilitation Act of 1973, 29 U.S.C.A. §**
**701 *et seq*.)**

104.    Plaintiff realleges and incorporates all prior paragraphs as if they were set forth again herein.

105.    Plaintiff engaged in protected activity when she requested a reasonable accommodation on May 2, 2023, and confirmed her request on May 5, 2023.

106.    Immediately following, and in response to, her accommodation request, Plaintiff was placed on a Performance Improvement Plan based on the very symptoms she had disclosed to Defendant. She was ultimately terminated under this PIP approximately one month after returning from medical leave, even though she had fulfilled all its conditions and the term of the PIP had lapsed.

107.    Over the five months following, and in response to, her request for accommodation, Plaintiff was systematically targeted by Bezel and Tolber through discipline based on fabricated performance issues, culminating in her termination in September 2023.

108.    Defendant is therefore liable to Plaintiff for compensatory relief, and attorney fees and costs.

## FOURTH CAUSE OF ACTION

**(Disability Discrimination under the New York City Human Rights Law,**
**New York City Administrative Code § 8–107 *et seq*.)**

109.    Plaintiff realleges and incorporates all prior paragraphs as if they were set forth again herein.

110.    Defendant CFA Institute employs more than four employees.

111.    Plaintiff suffers from a disability within the meaning of the NYCHRL:  her anxiety results in a psychological impairment which impairs the functioning of her neurological system.

112.    Plaintiff was more than qualified to perform the essential functions of her job with reasonable accommodations: she was promoted twice, most recently to her position as Director of Member Outreach, within less than four years after she was hired, and at the time of her termination had more than two decades of national and international marketing, brand, strategy, and association experience.

113.    Defendant systematically undermined, disciplined, and ultimately terminated Plaintiff because of her disability.

114.    Defendant acted in a willful, or at least reckless, manner by undermining, disciplining, and terminating Plaintiff because of her disability.

115.    Defendant is therefore liable to Plaintiff for compensatory relief, punitive damages, attorney fees and costs, and pre-judgment interest.

## FIFTH CAUSE OF ACTION

**(Regarded-As Disability Discrimination under New York City Human Rights Law, New York City Administrative Code § 8–107 *et seq.*)**

116.    Plaintiff realleges and incorporates all prior paragraphs as if they were set forth again herein.

117.    Defendant employs more than four employees.

118.    Defendants regarded Plaintiff as suffering from a disability within the meaning of the NYCHRL: once Plaintiff disclosed her anxiety symptoms, Defendant perceived Plaintiff as less capable of performing her job as evidenced by its immediate establishment of a PIP.

119.    Plaintiff was more than qualified to perform the essential functions of her job with reasonable accommodations: she was promoted twice, most recently to her position as Director of Member Outreach, within less than four years after she was hired, and at the time of her termination had more than two decades of national and international marketing, brand, strategy, and association experience.

120.    Defendants systematically undermined, disciplined, and ultimately terminated Plaintiff because of their erroneous perception that her disability made her a less capable employee.

121.    Defendant acted in a willful, or at least reckless, manner by undermining, disciplining, and terminating Plaintiff because of its erroneous perception that her disability made her a less capable employee.

122.    Defendant is therefore liable to Plaintiff for compensatory relief, punitive damages, attorney fees and costs, and pre-judgment interest.

**SIXTH CAUSE OF ACTION**

**(Retaliation under the New York City Human Rights Law, New York City Administrative Code § 8–107 *et seq.*)**

123.    Plaintiff realleges and incorporates all prior paragraphs as if they were set forth again herein.

124.    Plaintiff engaged in protected activity when she requested a reasonable accommodation on May 2, 2023, and confirmed the request on May 5, 2023.

125.    Immediately following, and in response to, her accommodation request, Plaintiff was placed on a Performance Improvement Plan based on the very symptoms she had disclosed to Defendant. She was ultimately terminated under this PIP approximately one month after

19

returning from medical leave, even though she had fulfilled all its conditions and the term of the PIP had lapsed.

126.    Over the five months following, and in response to, her request for accommodation, Plaintiff was systematically targeted by Bezel and Tolber through discipline based on fabricated performance issues, culminating in her termination in September 2023.

127.    Defendant acted in a willful, or at least reckless, manner by undermining, disciplining, and terminating Plaintiff because of her request that Defendant accommodate her disability.

128.    Defendant is therefore liable to Plaintiff for compensatory relief, punitive damages, attorneys' fees and costs, and pre-judgment interest.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.  Issuance of a declaratory judgment that the practices complained of herein are unlawful under the ADA and NYCHRL, and a permanent injunction against Defendants' continued engagement in such practices;

b.  Compensatory damages;

c.  Attorneys' fees and costs;

d.  Pre-judgment interest;

e.  Punitive damages; and

f.  Such other and further relief as this Court finds just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to FRCP 38(b), Plaintiff demands a trial by jury on all question of fact raised by the Complaint.

Dated: New York, New York
July 15, 2024

By: _____/s/_____
Heather Weddle
*Pro Se Plaintiff*

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**New York District Office**
33 Whitehall St, 5th Floor
New York, NY 10004
(929) 506-5270
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
### (This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: 04/17/2024

**To:** Heather Weddle
295 Greens Farms Road
Westport, CT 06880
Charge No: 520-2024-01548

EEOC Representative and email:     MADELINE MCGRATH
Investigator
madeline.mcgrath@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request that the agency issue a Notice of Right to Sue, where it is unlikely that EEOC will be able to complete its investigation within 180 days from the date the charge was filed.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Digitally Signed By:Yaw Gyebi, Jr.
04/17/2024
Yaw Gyebi, Jr.
District Director

EEOC Form 5 (04/22)

| CHARGE OF DISCRIMINATION<br>This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | State or local Agency, if any | and EEOC |

| Name (indicate Mr., Ms., Mrs., Miss, Ms., Dr., Hon., Rev., etc.)<br>Ms. Heather Weddle | Home Phone<br>203-292-3618 | Year of Birth<br>5·15·1969 |
|---|---|---|

Street Address, City State and ZIP Code

295 Greens Farms Road, Westport, CT 06880

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name<br>CFA Institute | No. Employees, Members<br>500+ | Phone No.<br>(434) 951-5499 |
|---|---|---|

Street Address, City State and ZIP Code

915 East High Street, Charlottesville, VA 22902

| Name | No. Employees, Members | Phone No. |
|---|---|---|

Street Address, City, State and ZIP Code

| DISCRIMINATION BASED ON<br>Disability discrimination and retaliation | DATE(S) DISCRIMINATION TOOK PLACE<br>Earliest: 4/2023    Latest: 9/15/2023 |
|---|---|

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**See Attached Document**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct.<br><br>12/6/2023<br>Date    Charging Party Signature | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT<br><br>SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

**Cc:**
Michael Taylor
CFA Institute
1401 New York Avenue, NW 3rd Floor
Washington, DC 20005

Veronica S Jung Esq.
The Law Offices of Veronica S. Jung, PLLC
745 Fifth Avenue Suite 500
New York, NY 10151

Owen Laird Esq.
The Law Offices of Veronica S. Jung, PLLC
745 Fifth Avenue Suite 500
New York, NY 10151


Please retain this notice for your records.

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

```
-------------------------------------------------- x
                                                    )
Heather Weddle,                                     )
                                                    )
                                                    )
                 Claimant,                          )
                                                    )
                                                    )
        v.                                          )
                                                    )
CFA Institute,                                      )
                                                    )
                 Respondents.                       )
                                                    )
-------------------------------------------------- X
```

STATE OF NEW YORK         )
                          ) ss.:
COUNTY OF NEW YORK        )

1. I submit this statement to assert my rights under Title VII of the Civil Rights Act of 1964, as amended.  I seek to invoke the authority of the Equal Employment Opportunity Commission ("EEOC") to investigate this Charge and request that the EEOC take remedial action to protect my rights.  I also file this Charge prior to the commencement of a civil action in the event that this Charge is not otherwise resolved.

2. As set forth more fully herein, I believe that respondent CFA Institute (the "Company") created and permitted discrimination based on disability and other protected characteristics, and that the Company retaliated against me and subjected me to disparate treatment because of my efforts to address and remedy the unlawful discrimination at the Company.

3. Respondent discriminated and retaliated against me by, among other things, terminating my employment with the Company on September 15, 2023.

4. I have been severely harmed by Respondent's unlawful conduct.  I seek an award of back pay and front pay, emotional distress damages, compensatory and punitive damages, attorneys' fees and costs, and an order directing Respondent to cease from its unlawful, discriminatory, and retaliatory conduct, together with any further and additional relief that the EEOC deems just and proper.

34. On May 1, I met with my Primary Care Doctor about my newly developed anxiety. This was the first time I had experienced this issue, and my doctor prescribed me an anti-anxiety medication and recommended to start talk therapy.

35. On or about May 2, 2023, I met with Megan Conklin, CFA Institute's Employee Relations Manager, via video call.

36. During this call I informed Ms. Conklin about my anxiety condition and described the way my anxiety impacted my work and working relationships at CFA.

37. I also told Ms. Conklin that that my anxiety condition stemmed from my work relationship with Ms. Tolber.

38. Ms. Conklin told me that my anxiety condition was a disability and that the company would be willing to discuss potential accommodations for me.

39. Ms. Conklin sent me a document summarizing this conversation on or about May 2, 2023.

40. That document noted, among other things, that I had stated that my anxiety impacts my ability to deliver publicly, impacts relationship building, career potential and performance reviews and inhibits my ability to work in certain team environments, causes self-doubt and deterioration of my self-confidence.

41. CFA gave me a week, until May 9, 2023, to determine whether I wanted to proceed with an accommodation request.

42. CFA institute noted that some potential accommodations included adding breaks between meetings, reducing the frequency of my 1:1 meetings with Ms. Tolber, and having Ms. Tolber provide me with a written "list of priorities, expectations, and instructions on any new tasks or projects to be received after one on ones and/or as needed."

43. On or about May 5, 2023, CFA Institute issued me a Performance Improvement Plan ("PIP"). Ms. Tolber authored the PIP – the narrative portions are written from Ms. Tolber's perspective.

44. The PIP primarily criticized my communication style: I was placed on notice for not being inclusive or collaborative, for being argumentative and critical, and for expressing that my team and I are "worried."

45. It felt as though I was being explicitly criticized for the effects of my anxiety. Much of the problematic "behavior" identified by Ms. Tolber in the PIP was precisely what I had described to Ms. Conklin as symptoms of my anxiety.

5. There are additional facts that demonstrate that Respondent engaged in unlawful conduct and which I have not included in this Charge. I reserve all my rights to seek judicial and other relief under any applicable federal, state, or local law and to supplement the facts described herein.

## **The Parties**

5. I, Heather Weddle ("Weddle"), am the Claimant in this action. I am a 54-year-old woman and am a citizen of the United States.

6. Respondent CFA Institute is an international not-for-profit organization that provides education and services for financial/investment professionals. CFA Institute is based in Charlottesville, VA and has offices throughout the world, including an office located at 292 Madison Avenue in New York City. CFA Institute has roughly 500 employees.

## **Background**

7. I have spent my career working in marketing for various professional and business associations, holding positions such as Brand Director, Marketing Director, and Strategy Director.

8. In and around Spring 2017 I applied for the position of Director of Member Outreach at CFA Institute.

9. As part of the application process I interviewed with Head of Content and Publishing and other senior executives including Ann O'Brien, Global Head of Brand and Communications and Connie English, Head of Talent and Acquisition

10. With over 15 years of national and international marketing, brand, strategy and association experience I offered a demonstrated ability for designing marketing and organizational strategies that enhance brand value and drive organizational growth.

11. CFA Institute offered me the Director, Member Outreach position on or about April 4, 2017, and I accepted. I signed an employment agreement with the company on or about April 5, 2017, with my employment at CFA Institute commencing on or about April 28. 2017.

12. As Director, Member Outreach, I was tasked with developing and managing process, protocols and delivery of member communications strategy across all regions (domestically and internationally). I served as key business lead for member personalization initiatives and provided subject matter expertise and support in cross-collaboration on projects throughout the organization.

13. Initially, I enjoyed great success at CFA Institute. I developed and launched a global member communication campaign that increased engagement and drove operational efficiencies. I earned recognition from CFA Institute for bringing a new technological capability to the organization.

14. I was promoted on September 11, 2019, to Senior Director of Member and Society Marketing with an expanded remit including supporting communications and marketing for 160 CFA Societies around the globe.

15. I continued to thrive in this new position. I was one of a few Directors selected to participate in various internal leadership courses, as well as external training programs.

16. During this time I received positive performance evaluations, annual pay increases, and bonuses.

17. However, during this time the work culture at CFA Institute grew increasingly uncertain. In and around September 2019, CFA Institute hired a new CEO, Margaret Franklin. Shortly after her arrival COVID-19 upended our business landscape and Ms. Franklin was not able to adjust. Several key departures from the company – some voluntary, some involuntary – only made matters worse. The work culture grew toxic, shifting away from what had previously been a collaborative, inclusive, and positive environment.

18. Despite all this, I continued to perform well.

19. In the summer of 2020, Michael Collins – CFA Institute's Managing Director and Chief Marketing Director, and my supervisor – approached me about leading the Membership Division. The company was undergoing a re-structuring and Mr. Collins considered me a perfect fit for the role of Head of Global Membership reporting directly to him.

20. I started the new position - Director in October of 2020.

21. The leadership upheaval eventually reached my department when Mr. Collins left CFA institute in and around May 2022. I then began reporting to the new Chief Marketing Officer, Thomas Berry.

22. However, as part of another round of restructuring, I began reporting to Randi Tolber, the Senior Head of Global Society Relations.

23. I was concerned about this development. Ms. Tolber and I had previously worked together as peers collaborating on marketing and communications initiatives. During that time I met with CFA Institute's HR department to discuss Ms. Tolber using and/or representing my work as her own without permission.

24. HR advised me to address the concern directly with Randi, which I did; Ms. Tolber seemed taken aback and unaware that what she was doing was inappropriate, and not entirely receptive to my complaint.

25. I was worried that Ms. Tolber would not be supportive of me as a subordinate given this history, and, unfortunately, my work environment deteriorated significantly under her.

26. Ms. Tolber represented my work, thought leadership and operational successes as her own to other senior leaders at CFA Institute or without attribution. She managed with ambiguity, restructured work from other divisions without adding resources and disseminated minimal information making it more difficult for me to run the division effectively.

27. Ms. Tobler also began criticizing me for purported behavioral deficiencies. Ms. Tolber told me to "talk less" and "actively listen."

28. I am typically a straightforward and plainspoken person – I discuss my thoughts and opinions openly, whether positive or negative. This is how I had operated throughout my employment with CFA Institute without being received negatively – to the contrary, I was promoted several times.

29. I began experiencing anxiety almost immediately upon moving to Ms. Tolber's team. The transition was unorganized with inconsistent directions, unclear goals and expected outcomes and little acknowledgment, nor support for my work with colleagues and leaders. In essence, my role was being reduced from one where I was a strategic leader for the company to one where I had mainly administrative responsibilities.

30. This continued through the first 6 months reporting to Ms. Tolber. Over time, the deteriorating environment eroded my personal relationship with colleagues and affected my confidence.

31. The conditions at work wore me down. I became racked with self-doubt and began withdrawing during meetings with peers and leaders, contributing less and worrying constantly about my reputation and ability to do my job. I developed difficulty sleeping and was overwhelmed by thoughts of losing my job.

32. On April 26, I met with Tricia Bezek, Global HRBP and Global Senior Manager of Talent Acquisition to discuss the deteriorated working relationship with Ms. Tolber and how it caused me to develop anxiety. I provided email communication examples of how Ms. Tolber misrepresented, mischaracterized and was micro-aggressive towards me. I also told Ms. Bezek that it felt as though Ms. Tolber was stripping my of the strategic aspects of my role.

33. Ms. Bezek suggested I meet with Megan Conklin, Employee Relations Manager, to discuss ADA accommodations.

34. On May 1, I met with my Primary Care Doctor about my newly developed anxiety. This was the first time I had experienced this issue, and my doctor prescribed me an anti-anxiety medication and recommended to start talk therapy.

35. On or about May 2, 2023, I met with Megan Conklin, CFA Institute's Employee Relations Manager, via video call.

36. During this call I informed Ms. Conklin about my anxiety condition and described the way my anxiety impacted my work and working relationships at CFA.

37. I also told Ms. Conklin that that my anxiety condition stemmed from my work relationship with Ms. Tolber.

38. Ms. Conklin told me that my anxiety condition was a disability and that the company would be willing to discuss potential accommodations for me.

39. Ms. Conklin sent me a document summarizing this conversation on or about May 2, 2023.

40. That document noted, among other things, that I had stated that my anxiety impacts my ability to deliver publicly, impacts relationship building, career potential and performance reviews and inhibits my ability to work in certain team environments, causes self-doubt and deterioration of my self-confidence.

41. CFA gave me a week, until May 9, 2023, to determine whether I wanted to proceed with an accommodation request.

42. CFA institute noted that some potential accommodations included adding breaks between meetings, reducing the frequency of my 1:1 meetings with Ms. Tolber, and having Ms. Tolber provide me with a written "list of priorities, expectations, and instructions on any new tasks or projects to be received after one on ones and/or as needed."

43. On or about May 5, 2023, CFA Institute issued me a Performance Improvement Plan ("PIP"). Ms. Tolber authored the PIP – the narrative portions are written from Ms. Tolber's perspective.

44. The PIP primarily criticized my communication style: I was placed on notice for not being inclusive or collaborative, for being argumentative and critical, and for expressing that my team and I are "worried."

45. It felt as though I was being explicitly criticized for the effects of my anxiety. Much of the problematic "behavior" identified by Ms. Tolber in the PIP was precisely what I had described to Ms. Conklin as symptoms of my anxiety.

46. CFA Institute's PIP required that I schedule additional meetings with Ms. Tobler – beyond my regularly scheduled 1:1 meetings – over the course of the PIP to discuss my progress.

47. CFA Institute's PIP gave me 45 days to "improve," with an end date for the PIP of June 19, 2023.

48. The PIP stated that if I failed to satisfy the PIP I could be terminated without notice.

49. I was dismayed upon receiving the PIP. Not only did it feel as though CFA Institute was punishing me for the symptoms of my clinical anxiety – anxiety that was caused by the environment at CFA Institute – but the punishment itself would lead only to further anxiety.

50. On or about May 5, 2023, I confirmed to Ms. Conklin that I wanted to proceed with the accommodation process.

51. On or about May 17, I met with CFA Institute's Employee Relations department to discuss my disability and submit a medical certification form requesting accommodations under the ADA.

52. The medical certification form indicated that I suffered from anxiety, and that my anxiety negatively affects my interactions with others, creates difficulty building relationships, and limits my social interaction.

53. During the meeting on May 17, CFA Institute's Employee Relations department provided me with a revised list of potential accommodations.

54. CFA Institute was no longer willing to adjust the frequency of my 1:1 meetings with Ms. Tolber, but noted that I would be allowed to turn off my video camera during these meeting.

55. CFA Institute agreed to allow me a 30-minute break in the morning and a 5-minute break in the afternoon.

56. CFA Institute also was no longer willing to have Ms. Tolber provide me with a written list of priorities, expectations, and instructions. Instead, CFA's proposed accommodation was to have me write for her i) a summary of each meeting with Ms. Tolber, ii) a list of priorities for the week and iii) a summary of my tasks. Ms. Tolber was then to respond confirming the list or providing additional context.

57. I was very disappointed to see that CFA's proposed accommodation amounted to a significant amount of additional work and interaction with Ms. Tolber, when what I had originally discussed with CFA Institute was the opposite, but I agreed to the proposed accommodations.

58. I worked very hard to meet the requirements of her PIP and to satisfy Ms. Tolber, including the extra work of summarizing her meeting and tasks for Ms. Tolber.

59. Between May 17, 2023, and June 12, 2023, I continued to performed my duties as expected and did my best to address the issues outlined in the PIP. I worked on two special projects which required cross-divisional video calls and collaboration, and also planned and led a 2-day, in-person cross-divisional strategy planning workshop with staff and outside consultants at the headquarter office in Charlottesville, VA. No negative or constructive feedback was provided by my supervisor or peer group during or after any of the above activities.

60. However, the conditions at CFA institute did not improve and my anxiety continued to worsen.

61. On or about June 12, 2023, I met with my primary care doctor. I noted that my condition was not improving even with medication; she indicated to me that a medical leave of absence from CFA institute would be appropriate.

62. Later that day, I met with CFA Institute's Employee Relations department to discuss the leave. I submitted documentation requesting an 8-week medical leave from June 14, 2023 through August 8, 2023. CFA Institute raised the possibility of using FMLA leave and provided me with resources on applying for short-term disability.

63. The next day, June 13, 2023, I met again with CFA Institute's Employee Relations department to discuss a leave of absence.

64. CFA's Institute informed me that the PIP – which was due to end on June 19 – would be revisited and possibly extended upon her return from leave.

65. I was disappointed to hear this and asked what the basis for extending the PIP on my return would be, given that there were only a few business days remaining on the PIP, and one of them was a holiday.

66. CFA Institute could not provide me with any additional detail about the PIP at that time.

67. I went out on medical leave on June 14, 2023.

68. I had several email communications with Megan Conklin during my medical leave to resolve administrative issues with my benefits with the insurance companies. I also completed and sent a Return To Work form – that had been provided by the Company – on or about July 25, 2023. In that form I included a request that the ADA accommodation remain in place upon my return.

69. My medical leave ended on August 8, 2023, and I returned to work on August 9, 2023.

70. Unfortunately there was no significant change in Ms. Tolber's conduct towards me.

71. On or about August 10, 2023, I met with Ms. Tolber via videocall to discuss the PIP. Ms. Tolber confirmed that I had successfully completed the PIP. During this call I shared with Ms. Tolber that I was going to schedule a meeting with Ms. Bezek to discuss my experience with the PIP.

72. Accordingly, on August 22, 2023, I met with Ms. Bezek. I discussed the process of the PIP. I noted to her that I did not receive most of the feedback or counseling that the PIP indicated that I should have. I also asked if I would be eligible for my annual bonus. Ms. Bezek could not answer my questions about the bonus, but suggested that I follow up with Ms. Tolber about the PIP.

73. I then met again with Ms. Tolber and Ms. Bezek on or about September 9, 2023, to review the PIP in more detail. The agenda for this meeting included 1) Specific feedback from Ms. Tolber, 2) Confirmation of PIP and Year End bonus implications 3) Ms. Tolber to share expectations of my role going forward.

74. On this call, Ms. Tolber told me that I would be receiving a "Needs Improvement" rating at my year-end review which eliminated me from the bonus pool. I had never received a "Needs Improvement" rating before, and I was confused and frustrated because – having satisfied the PIP and received Ms. Tolber's endorsement, I believed I had "improved."

75. Ms. Tolber went on to tell me that my role was to manage the team. This was even more concerning to me, as one of the concerns I had previously voiced with HR earlier that year was that Ms. Tolber was stunting my professional growth and reducing my role to administrative, not strategic.

76. This conversation made me extremely anxious. It felt as though all the work in the PIP had been for nothing, that all the work I had done both inside and outside of the workplace to address my anxiety condition had been for nothing, and that neither Ms. Tolber nor CFA Institute had any interest in me, my condition, or my success at the company.

77. Unhappy, I then shared what I felt needed to be successful: i) greater transparency from her, ii) her allowing me to lead projects and/or meetings without her, iii) allowing me to make decisions for the department that are commensurate with my level, and iv) her supporting my work with internal staff and leadership. Neither Ms. Tolber nor Ms. Bezek seemed interested in the substance of what I had to say; rather, Ms. Bezek told me that my tone was "unprofessional," and she and Ms. Tolber terminated the call.

78. On September 12, 2023, I spoke with Ms. Bezek to share my frustration with the PIP, the PIP meeting, and Ms. Tolber's decision on my Year End rating. I asked how HR could advocate for me and my improvement. Ms. Bezek confirmed that I could disagree with

-8-

the Year End rating in the comments section of the review form, but gave me no indication that I could attempt to reverse the decision.

79. On the morning of September 15, 2023, Ms. Tolber emailed me requesting a 15-minute meeting. I responded and told her that I was attending a workshop that morning. Ms. Tolber requested that I step out of the workshop at 10:30 am and take the call.

80. When I stepped out and called Ms. Tolber at 10:30, Ms. Bezek also joined the call. Ms. Tolber spoke first and stated that the expectations for conduct as outlined in the PIP were not being sustained and therefore, they had made the decision to terminate my employment. She then handed over the conversation to Tricia who outlined the details of the termination and next steps. The call ended after 10 minutes and I was locked out of the work systems shortly thereafter.

### Conclusion

81. CFA Institute created a work environment so toxic that I developed clinical anxiety. I complained to CFA Institute about the work conditions and the anxiety they caused. CFA Institute responded by issuing me a Performance Improvement Plan that criticized me for the very symptoms of my anxiety and threatened me with termination. In response to being notified of my medical condition, CFA Institute granted me accommodations that entailed more work and more communication with Ms. Tolber, the individual causing my anxiety.

82. Despite my suffering, I continued to work hard and fulfill my job responsibilities despite all this, up until the point when my condition required me to take medical leave. I took that leave, returned on schedule, and stepped back into my duties. I fulfilled the terms of CFA Institute's PIP. Though the environment and Ms. Tolber's behavior had not changed, I persevered even though my anxiety had not abated. CFA Institute then terminated me approximately one month after my return from leave, claiming that I had not met the conditions of the PIP – the conditions that, again, were based largely on my medical condition.

83. In light of the above, CFA Institute violated Federal, state, and local law by discriminating against me because of my legally protected disability and by retaliating against me for my use of accommodation.

Heather Weddle